**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DONALD WEBSTER, | ) | CASE NO: 1:10-cv-1587 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | NANCY A. VECCHIARELLI |
| FREEDOM DEBT RELIEF, LLC *et al.*, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendants. | ) | Doc. No. 18, 23, 25 |

This case is before the magistrate judge on referral.  Before the Court is the motion of defendant Century Negotiations, Inc. ("Century") to dismiss the complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(1) ("R. 12(b)(1)") and Fed. R. Civ. P. 12(b)(6) ("R. 12(b)(6)") or, in the alternative, to stay the proceedings pending arbitration ("Century's motion").  Doc. No. 18.  Also before the court is the motion of defendants Global Client Solutions, LLC ("Global") and Rocky Mountain Bank and Trust ("Rocky Mt.") to compel arbitration ("the Global/Rocky Mt. motion").  Doc. No. 23. Plaintiff, Donald Webster ("Webster") opposes both motions to compel. Doc. No. 60, 62.  For the reasons given below, Century's motion should be GRANTED by dismissing Webster's claims with prejudice.  The motion of Global and Rocky Mt. to compel should be GRANTED in part and DENIED in part, that is, denied as to enforcement of arbitrator-selection and arbitration

procedures but otherwise granted.

Global and Rocky Mt. also have pending before the court a motion to dismiss Webster's claims against them on grounds unrelated to arbitration, that is, pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).  Doc. No. 25.  As Webster's claims against Global and Rocky Mt. should be sent to arbitration, Global and Rocky Mt.'s motion to dismiss should be DENIED, as the court lacks jurisdiction to decide the merits of this action.

I

Except where otherwise noted, Webster pleads or does not deny the following relevant facts.

Webster is a resident of Mentor, Ohio.  Freedom Debt Relief, LLC ("FDR") is a Delaware company with a principal place of business in California.  Century is a Pennsylvania corporation with a principal place of business in Pennsylvania.  Global is an Oklahoma company with a principal place of business in Oklahoma.  Rocky Mt. is a Colorado financial institution with a principal place of business in Colorado.  Webster purports to bring this action in the interests of a class of at least 100 persons who would assert claims totaling at least $5,000,000 exclusive of interest.

FDR and Century are in the business of settling, adjusting, liquidating, or prorating debt for their customers. FDR and Century jointly market their products, share customer contacts, and use similar or identical forms and documents.  Global maintains accounts at such financial institutions as Rocky Mt. for the purpose of distributing funds to creditors of FDR's and Century's customers.  Global receives funds from those debtors and places the funds in its accounts until some or all of those funds are disbursed.

Webster's monthly payments on his credit cards increased when the issuing

-2-

institutions raised their interest rates.  He saw an advertisement by FDR which claimed that

the company could reduce debt obligations.  Webster contacted FDR at the toll-free

telephone number in the advertisement.  An FDR representative then contacted Webster

by e-mail and explained the debt relief programs that were available.  FDR then e-mailed

Webster a copy of the agreement, which was captioned with Century's name and logo.

Webster completed the agreement on January 12, 2009.  No representative of FDR or

Century explained the online contract to him or reviewed its terms.  A representative of

FDR did tell him, however, that he needed to enroll in the program quickly to take part in

a "special offer."  Webster completed the 8-10 page Debt Reduction Agreement ("the

Century agreement") in about 12 minutes.

Included in the agreement was a clause regarding arbitration of disputes arising

under the contract:

> 9. Arbitration of Dispute: IN THE EVENT OF ANY DISPUTE BETWEEN THE
> PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE
> PARTIES AGREE TO SUBMIT THAT DISPUTE TO BINDING ARBITRATION
> UNDER THE AUSPICES OF THE AMERICAN ARBITRATION ASSOCIATION
> (AAA).  VENUE FOR SUCH ARBITRATION WILL BE IN PITTSBURGH, PA.
> BINDING ARBITRATION MEANS THAT BOTH PARTIES GIVE UP THE RIGHT TO
> A TRIAL BY JURY.  IT ALSO MEANS THAT BOTH PARTIES GIVE UP THE RIGHT
> TO APPEAL FROM THE ARBITRATORS RULING EXCEPT FOR A NARROW
> RANGE OF ISSUES THAT ARE APPEALABLE UNDER PENNSYLVANIA LAW.
> IT ALSO MEANS THAT DISCOVERY MAY BE SEVERELY LIMITED BY THE
> ARBITRATORS.

Century agreement, Unopposed Motion to withdraw document and substitute Exhibit, Doc.

No. 46, Exh. 1, p. 2.  The Century agreement also contained a provision allowing either

party to terminate the agreement at will.  *Id.* at 3.  Finally, the Century agreement provided

that the agreement was to be governed by Pennsylvania law.  *Id.* at 2.

In connection with Webster's agreement with Century, he also completed in January

2009 a Special Purpose Account Application (the application") to open a bank account at a bank selected by Global, and received a copy of the Rocky Mt. Account Agreement and Disclosure Statement ("the banking agreement") when he completed his application.  The banking agreement provided that when the account was opened, Global would administer the account.  The application Webster signed provided in relevant part as follows:

> I hereby apply for and establish a non-interest bearing special purpose account (the "Special Purpose Account") to be administered at a bank selected by Global Client Solutions LLC ("Global") for the purpose of accumulating funds to repay my debts in connection with a debt settlement program (the "Program") sponsored by the organization identified below (the "Sponsor"). I understand that the Special Purpose Accounts features, terms, conditions and rules are further described in an Account Agreement and Disclosure Statement that accompanies this Application (the "Agreement") or as published at http://tinvurl.com/dj6gla. ***I acknowledge that I have received a copy of the Agreement or have viewed the agreement at the website above; that I have read and understand it; that the Agreement is fully incorporated into this Application by reference; and that I am bound by all of its terms and conditions***.

Application, attached to the Declaration of Douglas L. McClure, the Global/Rocky Mt. motion, Exh. A (emphasis in the original).  The banking agreement contained an arbitration clause that provided as follows:

> **Arbitration and Application of Law**:  In the event of a dispute of claim relating in any way to this Agreement or our services, you agree that such dispute shall be resolved by binding arbitration utilizing a qualified independent arbitrator of our choosing.  Further, you agree that any arbitration shall take place in Colorado Springs, Colorado and that the laws of the State of Colorado shall apply.  The decision of an arbitrator will be final and subject to enforcement in a court of competent jurisdiction.

The banking agreement, attached to the McClure Decl., p. 2.  The banking agreement also provided that Colorado law would govern the agreement.  *Id.* at 3.

On July 16, 2010, Webster filed a complaint in this court against FDR, Century, Global, Rocky Mt., and Jon and Jane Does A-K.  The complaint alleged violations of the

-4-

Ohio Debt Adjusting Act ("DAA"), violations of the Ohio Consumer Sales Practices Act ("CSPA"), civil conspiracy, and aiding and abetting and sought damages, rescission, injunctive relief, attorneys' fees, and costs.  On October 5, 2010, Century, Global, and Rocky Mt. filed the motions currently before the court.

II.

Global and Rocky Mt. move to compel arbitration.  Century couches its motion in the alternative:  either to dismiss pursuant to R. 12(b)(1) or R. 12(b)(6) or to compel arbitration.  However, Century moves for dismissal only on the basis that the court should compel arbitration.  According to Century, all of Webster's claims must be submitted to arbitration.  Century cites caselaw in support of the proposition that when all the claims in a complaint must be submitted to arbitration, the better practice is to dismiss the case rather than staying the proceedings pending arbitration.  Century also cites caselaw that shows a split of opinion as to whether such a dismissal should be pursuant to R. 12(b)(1) for lack of jurisdiction or pursuant to R. 12(b)(6)  for failure to state a claim upon which relief may be granted.  Consequently, although Century moves to dismiss the case, it does so on the ground that all of Webster's claims must be submitted to arbitration.  The gravamen of Century's motion, therefore, is a motion to compel arbitration.  Whether the case should be dismissed or stayed is an issue to be determined only if Century's motion to compel is granted.

In *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983), the Supreme Court declared that the "primary, substantive provision" of the Federal Arbitration Act ("FAA") was as follows:

A written provision in any maritime transaction or a contract evidencing a transaction

-5-

involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  The FAA reflects a "a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary," *AT&T Mobility LLC v. Concepcion*, ___ U.S. ___, ___, 131 S. Ct. 1740, 1749 (2011) (quoting *Moses H. Cone*, 460 U.S. at 24).  The FAA reflects the "fundamental principle that arbitration is a matter of contract." *Concepcion*, 131 S. Ct. at 1745 (quoting *Rent–A–Center, West, Inc. v. Jackson,* ___ U.S. ___, ___, 130 S.Ct. 2772, 2776 (2010)).  Consequently, courts must treat arbitration clauses the same as other contract provisions and enforce them according to their terms.  *Concepcion*, 131 S. Ct. at 1745.  Arbitration clauses may be declared unenforceable only "upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* (quoting 9 U.S.C. § 2).  Arbitration clauses may be invalidated, therefore, by such defenses as "'fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion*, 131 S. Ct. at 1746 (quoting *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687 (1996)).  In particular, the FAA displaces state laws declaring that class waivers in consumer arbitration agreements are unconscionable if the agreement is in an adhesion contract.  *Concepcion*, 131 S. Ct. at 1752-53.

Section 3 of the FAA requires courts to stay litigation of claims that the parties have agreed to arbitrate pending the agreed-upon arbitration.  Section 4 requires courts to compel arbitration "in accordance with the terms of the agreement" upon motion of any party to the agreement, unless the "making of the arbitration agreement or the failure . . . to perform the same" is at issue.  *See also Concepcion*, 131 S. Ct. at 1748.  However, if

all the claims before the court are subject to arbitration, the court may dismiss the entire case with prejudice.  *See Green v. Ameritech Corp.*, 200 F.3d 967, 972-73 (6th Cir. 2000) (citing *Alford v. Dean Witter Reynolds, Inc.,* 975 F. 2d 1161 (5th Cir. 1992)); *see also Hensel v. Cargill, Inc.*, 1999 WL 993775, at *4 (6th Cir. Oct. 19, 1999).

In addition, the FAA requires that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself, or an allegation of waiver, delay, or a like defense to arbitrability."  *Moses H. Cone*, 460 U.S. at 24-25.  A court may not deny a motion to stay or dismiss "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *AT&T Tech., Inc. v. Comms. Workers*, 475 U.S. 643, 650 (1986).

III.

In the instant case, the Century agreement and the banking agreement are comprehensive and unequivocal with respect to arbitration.  The Century agreement provides, "In the event of any dispute between the parties arising out of or relating to this agreement, the parties agree to submit that dispute to binding arbitration under the auspices of the American Arbitration Association (AAA)."  Century agreement at 1.  The banking agreement similarly provides, "In the event of a dispute of claim relating in any way to this Agreement or our services, you agree that such dispute shall be resolved by binding arbitration utilizing a qualified independent arbitrator of our choosing."  The banking agreement at 1.   Neither agreement provides exceptions to or limitations on the requirement to arbitrate.

The claims Webster asserts arise out of or relate to the Century agreement and the

banking agreement.  Webster alleges that defendants either (1) fraudulently and illegally diverted to themselves (in the form of fees) payments he made for the purposes of satisfying creditors without performing the services that defendants promised to render pursuant to their agreements with him; (2) conspired in this allegedly fraudulent and illegal scheme; or (3) aided and abetted this allegedly fraudulent and illegal scheme.  These allegations arise from the primary substance of the Century and banking agreements. Consequently, the claims in the complaint fall squarely within the arbitration requirement.

Much of Webster's response goes to the merits of his claims.  Whether Webster's claims are meritorious, however, is not the issue before the court.  The question before the court is only whether Webster's claims must be submitted to arbitration.  Webster's relevant objections include the following:  (1) Century cancelled its agreement and the arbitration clause; (2) there are no agreements to arbitrate because the arbitration clauses are illusory and unenforceable; (3) the arbitration agreements are unenforceable because they violate public policy as expressed in the CSPA; (4) defendants assert facial challenges to the DAA that cannot be arbitrated; (5) the arbitration clauses are unconscionable and unenforceable. The court shall examine each of these objections in turn.

A.      *Whether Century cancelled its agreement and its arbitration clause*

Webster alleges that Century cancelled the Century agreement after a creditor sued Webster.  Webster argues that because Century cancelled the Century agreement, it may not enforce the arbitration clause contained in that agreement.  The court need not determine whether Century, indeed, cancelled the Century agreement, as it would make no difference if it did.

As already noted, the Century agreement contained a provision allowing either party

to terminate the agreement at will.  Century agreement at 2.  Consequently, there is no indication in the pleadings before the court that Century violated its agreement with Webster by cancelling it, nor does Webster allege that it did.  For this reason, Century's cancellation does not, by itself, allege a failure to perform pursuant to the agreement, which would be a possible ground for declining to enforce the arbitration clause.

If Webster means to imply that Century may not enforce an arbitration agreement in a cancelled contract, the Supreme Court has held otherwise.  When a dispute involves facts and occurrences arising while a contract, including an arbitration clause, is in effect, then the requirement to arbitrate survives the termination of the contract.  *Nolde Bros., Inc. v. Bakery Workers*, 430 U.S. 243, 249-51 (1977); *see also Litton Financial Printing Div. v. NLRB,* 501 U.S. 190, 203-08, 208 n.3 (1991) (citing cases with approval).

For these reasons, Webster's argument that the court may not enforce the arbitration clause because Century cancelled the Century agreement is not well-taken.

B.      *Whether there are no arbitration agreements in the Century and banking agreements because the supposed arbitration agreements are illusory and unenforceable*

Webster contends that the making of the arbitration clause is itself at issue because the arbitration agreement was rendered "illusory and unenforceable" by language giving Century, Global, and Rocky Mt. an unfettered right to modify the terms of their agreements.

A federal court asked to determine whether a contract containing an arbitration clause is enforceable looks to the relevant state's contract law.  *See Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306 (6th Cir. 2000).  In the instant case, the Century agreement includes a provision specifying that the agreement is governed by Pennsylvania law.  The banking agreement includes a provision specifying that it is governed by Colorado

-9-

law.  The court shall examine the Century and banking agreements separately in light of the relevant contract law to determine whether they are illusory and unenforceable.

> 1.    *Whether the Century agreement is illusory and unenforceable under Pennsylvania contract law*

Webster argues that the Century contract in general and the arbitration clause in particular are illusory and unenforceable because Century may alter the terms of the contract at will.  Thus, any promise made by Century is illusory because Century is free to modify the contract to dispense with its obligation.  Under Pennsylvania law, if a promise is entirely optional with the promisor, it is illusory, lacks consideration, and is unenforceable. *Lackner v. Glosser*, 2006 PA Super. 14, 892 A.2d 21, 31 ( 2006); *see also Geisinger Clinic v. Di Cuccio,* 414 Pa. Super. 85, 606 A.2d 509, 512 (1992).

In the instant case, the defendants do not have unfettered authority to modify or terminate the agreement.  First, defendants are required to provide Webster notice of any change in their agreements.  The Century agreement requires Century to give Webster 15 days' advance written notice of any modification of the agreement.  Century agreement at 2.  The banking agreement provides as follows:

> We may, at any time, and subject to applicable law, add, delete, or modify the terms, conditions, rights and responsibilities regarding your Account.  You will be notified of any changes.  However, if the change is made for security purposes, we can implement such change without prior notice. We reserve the right to add, delete, change, modify, or replace, from time to time, and without prior notice, any of our service providers, as we deem necessary in our sole discretion.

Banking agreement at 3.  The only plausible interpretation of this provision is that, except for security issues and changing service providers, the banking agreement requires prior notice of unilateral changes in the agreement.  Second, as discussed above, even if defendants alter or suspend the arbitration agreement, they are bound to arbitrate any

-10-

disputes arising under the version of the arbitration clause in effect at the time of the events giving rise to the dispute.  Taken together with clauses permitting either party to terminate the agreements upon written notice,[1] these constraints mean that defendants may only alter the agreements going forward, and Webster is free to terminate the agreements or acquiesce in the new terms.  The promises to arbitrate disputes arising from the agreements, therefore, are not optional with the defendants.  Consequently, those promises are not illusory and may serve as consideration for Webster's obligations under the contract.

> 2.    *Whether the banking agreement is illusory and unenforceable under Colorado contract law*

Colorado law provides that a contract is illusory and unenforceable if one party proffers illusory promises while retaining sole discretion whether to perform.  Under such circumstances, the contract lacks mutuality and may not be enforced.  *See Mark II Electronics, Inc. v. Dotson*, 163 Colo. 253, 254, 430 P.2d 82, 82-83 (1967); *Sentinel Acceptance Corp. v. Colgate*, 162 Colo. 64, 67, 424 P.2d 380, 382 (1967) (citing Restatement of Contracts, Sec. 2, comment (b) and Sec. 80, comment (b)); and *Mountain Finance Co. v. Powell*, 474 P.2d 172 (Colo. App. 1970).

As described above, both the Century agreement and the banking agreement bind defendants to provide prior notice of any change in the agreements, bind defendants to perform obligations incurred while a version of the agreement is in effect, and allow Webster to terminate the agreements if new terms are not to his liking.  Moreover, Colorado

---

[1] This has already been noted with respect to the Century agreement.  The banking agreement contains a similar provision.  *See* banking agreement at 2.

law holds that arbitration clauses are severable from the contracts that contain them and the duty to arbitrate survives cancellation of the contract. *Shams v. Howard*, 165 P.3d 876, 879 (Colo. App. 2007). Consequently, defendants' promises to arbitrate in the agreement are not illusory and do not give defendants discretion whether they shall arbitrate. The agreements are not, therefore, illusory and unenforceable pursuant to Colorado law.

As the arbitration agreements mutually obligate both defendants and Webster, they are not illusory or unenforceable. Webster's argument to the contrary is not well-taken.

C.    *Whether the arbitration agreements are unenforceable because they violate public policy as expressed in the Ohio Consumer Sales Practices Act*

Webster contends that the Century agreement and banking agreement are unenforceable because they violate public policy. In particular, Webster argues that they violate the public policy expressed in the CSPA in favor of class actions for consumers. Because the agreements substitute individual arbitration for class action, Webster concludes, the agreements are unenforceable as against Ohio's public policy.

After the parties completed briefing in this case, the Supreme Court decided *AT&T Mobility LLC v. Concepcion*, ___ U.S. ___, 131 S. Ct. 1740 (2011), holding that the FAA preempted California's judicial rule that waivers of class arbitration in consumer contracts were unconscionable. The Court found that the principal purpose of the FAA was to ensure that private arbitration agreements are enforced according to their terms and further found that California's ban on waivers of class action was "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 1753 (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941)).

In the wake of *Concepcion*, any public policy in favor of class action for consumers

-12-

in the CSPA is clearly superceded by the FAA as it is an obstacle to the accomplishment of the purposes and objectives of Congress. Consequently, Webster's contention that the Century agreement and banking agreement are unenforceable because they violate public policy is without merit.

D.    *Whether defendants assert a facial challenges to the Ohio Debt Adjusting Statute that cannot be arbitrated*

Webster also contends that his claims may not be submitted to arbitration because defendants Global and Rocky Mt. assert a facial constitutional challenge to the DAA that cannot be arbitrated.

Not all claims related to an arbitrable dispute may be submitted for arbitration, even when the arbitration clause is as broad as the clause in the present case. As Webster notes, claims between parties that are based on constitutional challenges or statutory causes of action may not be arbitable. In the Sixth Circuit, the standard used to determine whether a claim or dispute falls within the scope of an arbitration agreement is as follows: "if an action can be maintained without reference to the contract or relationship at issue, the action is likely outside the scope of the arbitration agreement-along with the presumption in favor of arbitrability and the intent of the parties." *Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 505 (6th Cir. 2007) (citing *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 395 (6th Cir. 2003)). This rule does not help Webster, however, for two reasons.

First, Webster's fundamental assumption, that Global and Rocky Mt. assert a facial challenge to the DAA, is erroneous. Those defendants assert the following in relevant part:

> The Debt Adjusting statutory provisions Plaintiffs allege and seek to have interpreted and applied to establish [Rocky Mt.]'s liability as an aider and abettor engaged in charging an illegal fee under the statute is unconstitutional if so applied and thereby would violate the United States Constitution, Article I, section 10, clause

-13-

1 (the "Contract Clause), Article I, section 8, clause 3 (the "Commerce Clause") and the Equal Protection and Due Process provisions of the Fifth and Fourteenth Amendments.

Motion of Global and Rocky Mt. to Dismiss, Doc. No. 25, p. 29.  That is, the defendants do not challenge the DAA's facial constitutionality.  Rather, they challenge Webster's belief regarding how the statute should be applied to the contracts between Webster and Global and Rocky Mt.  It is not possible, therefore, to resolve the issue of the constitutional challenge "without reference to the contract or relationship at issue."  Consequently, the challenge is within the scope of the arbitration agreement and should be accorded a presumption of arbitrability.

Second, the cases Webster cites in support of his contention that Global's and Rocky Mt.'s defense is not within the arbitration clause are not on point.  Webster cites *NCR Corp. v. Korala Associates, Ltd.*, 512 F.3d 807 (6th Cir. 2008), and *Simon v. Pfizer, Inc.*, 398 F.3d 765 (6th Cir. 2005), for the proposition that claims asserting a constitutional challenge are outside an arbitration agreement and are not arbitrable.  While this may be true, the present case does not involve claims asserting a constitutional challenge:  It involves *defenses* asserting a constitutional challenge.  In both *NCR* and *Simon*, the plaintiff who was *resisting* arbitration asserted constitutional or statutory challenges to defendants' conduct.  Here, the constitutional challenge is asserted by defendants who are *seeking* arbitration.  If the constitutional defense proves to be beyond the purview of arbitration, defendants' insistence on arbitration will disadvantage only themselves, not the other party.  Thus, *NCR* and *Simon* are not applicable to this case.

For the reasons given above, Webster's contention that his claims may not be submitted to arbitration because defendants Global and Rocky Mt. assert a facial

-14-

constitutional challenge to the DAA should be rejected.

E.      *Whether the arbitration clauses are unconscionable and, therefore, unenforceable*

Webster argues that the arbitration clauses are unconscionable and unenforceable because (1) they are unconscionable under Ohio law; (2) they are unconscionable under Colorado law; and (3) they are unconscionable under Pennsylvania law.  Defendants deny that the arbitration clauses are unconscionable.

Whether the arbitration clauses are unconscionable under Ohio law is not relevant. As already noted, the Century agreement must be adjudicated according to Pennsylvania law and the banking agreement according to Colorado law.

1.      *Whether the Century agreement is unconscionable according to Pennsylvania law*

Under Pennsylvania law, "generally applicable state-law contract defenses, such as fraud, duress, or unconscionability, still may be applied to invalidate arbitration agreements."  *Salley v. Option One Mortg. Corp. ("Salley I")*, 46 Fed. Appx. 87, 2007 WL 2274430, at *2 (3d Cir. Aug. 5, 2007) (quoting *Salley v. Option One Mortgage Corp. ("Salley II"), et al,* 592 Pa. 323, 925 A.2d 115, 119 (2007)).  Unconscionability is both a statutory and a common law defense to the enforcement of an allegedly unfair contract or provision in a contract.  13 Pa. C.S.A. § 2302; *Denlinger, Inc. v. Dendler*, 415 Pa. Super. 164, 608 A.2d 1061, 1067 (1992).  The party challenging the contract or provision has the burden of proving unconscionability by a preponderance of the evidence, and the issue is a question of law for the court.  *Worman v. FedEx Ground Package System Inc.*, 2005 WL 4312127, 76 Pa. D. & C.4th 292, 300 (2005);  *Bishop v. Washington,* 331 Pa. Super. 387, 399, 400, 480 A.2d 1088, 1094 (1984).  Thus, if there are no genuine issues of material

fact, "a court may conclude, as a matter of law, that a contract . . . is enforceable regardless of an allegation of unconscionability . . . ." *Hanover Architectural Products Inc. v. U.S. Filter/JWI, Inc.*, 79 Pa. D. & C.4th 407, 414 (C.P. 2006) (quoting *Bishop*, 331 Pa. Super. 387, 399, 480 A.2d at 1094).

A contract term is unconscionable and unenforceable when it is both procedurally and substantively unconscionable.  A contract is procedurally unconscionable if there is a lack of meaningful choice in whether to accept the challenged provision; a contract is substantively unconscionable when the provision unreasonably favors the party asserting it. *Salley I*, 2007 WL 2274430 at *3.

One consideration in determining whether a contract is procedurally unconscionable is whether the contract is an adhesion contract.   "An adhesion contract is defined as a 'standard form contract prepared by one party, to be signed by the party in a weaker position, [usually] a consumer, who has little choice about the terms.' " *Bayne v. Smith*, 2009 PA Super. 11, 965 A.2d 265 (2009) (quoting *Robson v. EMC Ins. Cos.,* 785 A.2d 507, 510 (Pa. Super. 2001)).  If a contract is deemed to be one of adhesion, its terms must be analyzed to determine whether the contract as a whole, or specific provisions of it, are unconscionable.  *Denlinger*, 415 Pa. Super. 164, 608 A.2d at 1067.  Pennsylvania courts will not, however, "hold contracts unconscionable simply because of a disparity in bargaining power." *Id.* (quoting *Witmer v. Exxon Corporation,* 495 Pa. 540, 551, 434 A.2d 1222, 1228 (1981)).  In determining whether a contract is procedurally unconscionable, Pennsylvania courts also consider whether there are alternative providers of the service under contract, thus providing consumers a meaningful choice in accepting an arbitration clause.

-16-

In the instant case, Webster alleges that the arbitration clause is procedurally unconscionable because he received a large and confusing array of documents from the parties when he entered into the contract, the clause was contained in an adhesion contract, Webster was unable to negotiate the arbitration clause or any other provision of the Century agreement, there was a shortage of alternative debt settlement companies available to Webster, and no one explained the arbitration clause to Webster.  As already noted, that the contract was a non-negotiable adhesion contract or that there was an inequality of bargaining power between the parties do not, by themselves, make a contract provision unconscionable.  The Century arbitration clause was part of a two-page Debt Reduction agreement, and it was the only provision in that agreement written entirely in capital letters.  Thus, Webster cannot claim that the arbitration provision was unfairly hidden from him.  Webster's own briefing contradicts his claim that there was a shortage of other debt companies available to him.  His briefing notes that there were a number of such companies, but that these companies also required arbitration of disputes.  Finally, even if no one explained the terms of the agreement to Webster, nothing precluded him from getting his own legal advice if he had difficulty understanding the agreement.  Webster cites no Pennsylvania law to support his contention that the provisions of or circumstances surrounding the Century agreement, separately or together, make Century's arbitration clause procedurally unconscionable.

In determining whether a contract provision is substantively unconscionable, a court must ascertain whether the provision unreasonably favors one party while unreasonably burdening the other.  *See Metzger*, 2005 WL 3947961, 75 Pa. D. & C.4th at 118-20.  In making this determination, a court must consider "the general commercial background and

the commercial needs of a particular trade" to decide whether "the clause is so one-sided that it is unconscionable under the circumstances." *Borden Inc. v. Advent Inc.*, 701 A.2d 255, 264 (Pa. Super. 1997).  Arbitration clauses that require a party to share the costs of arbitration, impose costs higher than the costs of judicial litigation, limit damages, limit discovery, preclude access to courts and a jury, bar class actions, or fail to require a written opinion from the arbitrator do not, of themselves, make an arbitration clause substantively unconscionable.  *See Worman.*, 2005 WL 4312127, 76 Pa. D. & C.4th 292; and *Metzger v. Star Pontiac, Inc.*, 2005 WL 3947961, 75 Pa. D. & C.4th 114 (C.P. 2005).

Webster alleges that the Century arbitration clause is substantively unconscionable because it allegedly contains multiple terms that eliminate or severely diminish the legal and equitable remedies of himself and other class members.  Specifically, Webster asserts that the Century arbitration clause eliminates the right to a trial by jury, eliminates the right of appeal, restricts discovery, and subjects Webster to higher costs than he would experience in Court.

As already noted, elimination of the right to a jury, restricted discovery, and higher costs than would be required for judicial litigation are not, of themselves, reasons to find an arbitration clause substantively unconscionable under Pennsylvania law.  Neither is a limitation on a right of appeal.  The arbitration clause in the Century agreement limits an appeal to the "narrow range of issue" appealable under Pennsylvania law.  In Pennsylvania a court's scope of review of an arbitrator's decision in Pennsylvania is governed by 42 Pa. C.S.A. § 7302.  This statute provides that a court may review an arbitrator's jurisdiction and may "modify or correct the award where the award is contrary to law and is such that had it been the verdict of a jury the court would have entered a different judgment or a judgment

-18-

notwithstanding the verdict." 42 Pa. C.S.A. § 7302(d)(2).  Thus, Pennsylvania law permits the limitations on parties' rights of appeal found in the Century agreement.  Such limitations, therefore, are not unconscionable under Pennsylvania law.  Again, Webster cites no Pennsylvania law to support his contention that the provisions of the Century agreement, separately or together, make Century's arbitration clause substantively unconscionable.

Webster also asserts that the costs of arbitrating his dispute with the AAA are so high that he is economically precluded from vindicating his rights as a consumer.  He cites costs totaling about $5,000 as necessary to pursue AAA arbitration.  He fails to support his claim, however.  The AAA Commercial Arbitration Rules and Mediation Procedures he cites in support of his claims includes the following provision:  "In an effort to make arbitration costs reasonable for consumers, the AAA has a separate fee schedule for consumer-related disputes.  Please refer to Section C-8 of the Supplementary Procedures for Consumer-Related Disputes when filing a consumer-related claim."  "Commercial Arbitration Rules and Mediation Procedures," Affidavit of Robert R. Sparks, Doc. No. 61, Exh. 4, p. 23.  Webster does not provide, quote, or cite the AAA's relevant consumer-related procedures or fees in making his argument.  Consequently, he fails to support his argument that the Century arbitration clause imposes prohibitive fees on consumers.

Pennsylvania law requires Webster to demonstrate by a preponderance of the evidence that the arbitration clause in the Century agreement is both procedurally and substantively unconscionable to prove that the clause should not be enforced.  Webster has failed to demonstrate either procedural or substantive unconscionability.  Consequently, his contention that the arbitration provision in the Century agreement is

-19-

unconscionable is not well-taken.

> 2. *Whether the banking agreement is unconscionable according to Colorado law*

Webster also argues that the arbitration clause in the banking agreement should not be enforced because the banking agreement is unconscionable.  The banking agreement is governed by Colorado law.

When the contract at issue is a standardized agreement executed by parties of unequal bargaining strength, the contract should be viewed with "a critical eye," much as Colorado courts view insurance contracts.  *See Bailey v. Lincoln General Ins. Co.*, ___ P.3d ___, 2011 WL 2150759, at *8 (Colo. May 16, 2011).  Contracts which are not the result of bargaining, are imposed on a "take it or leave it" basis, and are formed by parties having unequal bargaining power and sophistication, such as insurance contracts, increase the risk that the stronger party may intentionally or inadvertently exploit the weaker party.  *Id.* Such standardized contracts are seldom read by consumers and may grant coverage prominently on the face of the agreement while burying exclusions in fine print elsewhere. *Id.* at 9. The result of such contracts is that consumers may have reasonable expectations that the contracts fail to fulfill.

For these reasons, Colorado law focuses on a party's reasonable expectations in determining whether a contract is unconscionable.  The Colorado Supreme Court recently held that expectations are reasonable if (1) an ordinary, objectively reasonable person, based on the language of the contract, would not understand the ostensibly unconscionable provision, and, (2) because of circumstances attributable to the other party, an ordinary, objectively reasonable person would be deceived into believing that the contract does not

have the ostensibly unconscionable effect asserted by the other party. *Id.* at 8. A court confronted with a standardized contract has a duty to scrutinize it closely for provisions that unduly compromise the weaker party's interests to ensure that the contract complies with public policy and principles of fairness. *Id.* at 9. Moreover, when honoring the weaker party's expectations, that party need not have actually read the contract. "[T]he test to be applied is "what the ordinary reader and purchaser *would* have understood' [the] provisions to mean had they been read." *Id.* at 11 (quoting *Davis v. M.L.G. Corp.*, 712 P.2d 985, 989 (Colo. 1986)). In addition, terms should be read in the sense in which the stronger party had reason to believe they would be interpreted by the ordinary reader and purchaser.'"

*Bailey*, 2011 WL 2150759 at *11 (quoting *Davis*, 712 P.2d at 989).

Finally, under Colorado law,

to support a finding of unconscionability, there must be evidence of some overreaching on the part of one of the parties such as that which results from an inequality of bargaining power or under other circumstances in which there is an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to that party.

*Davis*, 712 P.2d at 991 (quoting *McMillion v. McMillion*, 522 P.2d 125, 129 (Colo. App. 1974)). Colorado courts look at a variety of factors in deciding how critically to view a contract and whether one or more of its provisions is unconscionable:

a standardized agreement executed by parties of unequal bargaining strength, lack of opportunity to read or become familiar with the document before signing it, use of fine print in the portion of the contract containing the provision, absence of evidence that the provision was commercially reasonable or should reasonably have been anticipated, the terms of the contract, including substantive unfairness, the relationship of the parties, including factors of assent, unfair surprise and notice; and all the circumstances surrounding the formation of the contract, including its commercial setting, purpose and effect.

*Id.* (citing with approval *Steven v. Fidelity & Casualty Co.,* 58 Cal.2d 862, 27 Cal. Rptr. 172,

377 P.2d 284 (1962) (finding unconscionability where the provision at issue was in a standardized contract, the purchaser was unable to read the policy in advance; and the provision was not plain or clear); *C & J Fertilizer, Inc. v. Allied Mutual Ins. Co.,* 227 N.W.2d 169 (Iowa 1975) (finding unconscionability where small print presented the provision at issue and there was no evidence that the provision was reasonable or should have been expected by another party); and *Blakeslee v. Farm Bureau Mutual Ins. Co.,* 388 Mich. 464, 201 N.W.2d 786 (1972) (finding unconscionability when an insurer offered statutorily mandated uninsured motorist coverage to collect a premium for the coverage while simultaneously limiting the coverage by means of an "other insurance" limitation).

In arguing that the banking agreement is unconscionable, Webster asserts that the agreement eliminates or severely diminishes Webster's legal and equitable remedies by disclaiming liability for special, incidental, consequential, exemplary, or punitive damages; eliminates the right to a trial by jury and the right of appeal; restricts discovery; eliminates the use of a class action; subjects Webster to higher costs than he would if he litigated his claims judicially; hides the clauses in fine print; buried the arbitration clause in a large number of documents; added the arbitration clause after the contract was formed; allows Global and Rocky Mt. to control and dictate the arbitration process after the arbitration occurs;  allows them alone to choose the arbitrator; and specifies no arbitration provider or rules applicable to the arbitration proceedings.

After citing *Davis* as the Colorado case summarizing the framework for analyzing unconscionability pursuant to Colorado law, Webster fails to apply that framework to analyze the banking agreement or cite a single Colorado case to support his assertion that the banking agreement's terms are unconscionable.  Global's and Rocky Mt.'s reply

-22-

similarly fails to apply the *Davis* framework or other Colorado law.  The court shall analyze Webster's objections to the arbitration clause, employing *Bailey* and *Davis* in its analysis.

There is no doubt that the banking agreement is a standard agreement.  In response to Webster's claim of lack of sophistication with respect to banking documents, defendants offer nothing more than the *non sequitur* that "Webster was savvy enough to sign-up [sic] for the credit cards and to incur substantial debt . . . ."  Reply at 20.  The court concludes, therefore, that the banking agreement should be viewed "with a critical eye" and with a view toward determining what an ordinary, objectively reasonable person would have understood from the banking agreement and whether such a person would have deceived into believing that the banking agreement does not have the ostensibly unconscionable effect asserted by defendants.  The court shall also consider whether the arbitration clause or its terms evidence overreaching by defendants.

Webster argues that the agreement eliminates or severely diminishes his legal and equitable remedies by disclaiming liability for special, incidental, consequential, exemplary, or punitive damages.  Two considerations undermine Webster's argument.  First, Webster seeks only compensatory damages (*i.e.*, the return of allegedly illegal fees and transfers from his account) and equitable relief to prevent such future fees and transfers.  Complaint at 17-19.  He cannot argue, therefore, that he has been unduly compromised by defendants' failure to fulfill his reasonable expectations.  Second, under common law, exemplary or punitive damages are not generally available as contract remedies, and special, incidental, and consequential damages have been disfavored as contract remedies since at least *Hadley v. Baxendale*, 156 Eng. Rep. 145 (1854).  *See* E. Allan Farnsworth, CONTRACTS, 2d ed., §§ 12.8, 12.14 (Little, Brown 1990).  Explicitly disclaiming damages

disfavored at law can hardly be considered overreaching.  Because Webster does not demonstrate that defendants' limitations on liability failed to fulfill his reasonable expectations or that the limitations on liability were overreaching, his argument that disclaiming special, incidental, consequential, exemplary, or punitive damages is unconscionable as not well-taken.

Webster also argues that the arbitration clause is unconscionable because it eliminates the right to a trial by jury and restricts discovery.  These are objections that might be made to nearly all forms of arbitration.  As the Sixth Circuit observed, "the loss of the right to a jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate."  *Burden v. Check Into Cash of Kentucky, LLC*, 267 F.3d 483, 492 (6th Cir. 2001) (quoting *Sydnor v. Conseco Fin. Servs. Corp.,* 252 F.3d 302, 307 (4th Cir. 2001)).  Section 13-22-209(1), Colorado Revised Statutes ("C.R.S."), provides that arbitrators may issue subpoenas for the production of documents and other evidence and that a party may petition the court to enforce such subpoenas.  Moreover, the Supreme Court has found that the limited discovery generally available in arbitration is offset by the simplicity, informality, and expedition of arbitration.  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991); *see also. R.P.T. of Aspen, Inc. v. Innovative Communications, Inc.*, 917 P.2d 340 (Colo. App. 1996) (upholding an arbitration agreement and nevertheless finding that arbitrators are not bound by substantive or procedural rules of law except as specified in the arbitration agreement).  Given the preference for arbitration expressed by the FAA and by Colorado's Uniform Arbitration Act, § 13-22-206(1), C.R.S., Webster's contention that waiver of the right to a jury and restrictions  on discovery render an arbitration clause unconscionable are not well-taken.

-24-

Nor does Colorado law support Webster's contention that the arbitration clause is unconscionable because it deprives him of a class action. Colorado law states unequivocally, "arbitration clauses are not unenforceable simply because they might render a class action unavailable." *Rains v. Foundation Health Systems Life & Health*, 23 P.3d 1249, 1253 (Colo. App. 2001). Webster's contention, therefore, is without merit.

Webster also contends that the arbitration clause is unconscionable because it deprives him of the right of appeal. Sections 13-22-220, 13-22-223, and 13-22-224, C.R.S., specify the grounds pursuant to which a court may vacate, modify, or remand for correction or clarification an arbiter's award. Webster cannot maintain that the banking agreement's implicit limitations on his right of appeal are unconscionable pursuant to Colorado law when those limitations are codified in Colorado's statutes.

Next, Webster argues both that the arbitration agreement subjects him to higher costs than he would incur if he litigated his claims judicially and to costs so high as to preclude him from maintaining his cause of action. As the arbitration clause does not specify an arbitrator or rules applicable to the arbitration proceedings, Webster relies on supposition to argue regarding the costs of the required arbitration. Such arguments are foreclosed by *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79 (2000). In that case, the Supreme Court held as follows:

> It may well be that the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum. But the record does not show that Randolph will bear such costs if she goes to arbitration. Indeed, it contains hardly any information on the matter. As the Court of Appeals recognized, "we lack ... information about how claimants fare under Green Tree's arbitration clause." The record reveals only the arbitration agreement's silence on the subject, and that fact alone is plainly insufficient to render it unenforceable. The "risk" that Randolph will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement.

*Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 90-91 (2000) (footnote and citation omitted). As in *Green Tree*, the arbitration clause in this case is silent on the subject of arbitration fees. Consequently, Webster's arguments that the arbitration agreement should not be enforced because it subjects him to higher costs than he would incur if he litigated his claims judicially and to costs so high as to preclude him from maintaining his cause of action are founded upon supposition. They are not, therefore, well-taken.

Webster's contention that the arbitration clause is hidden in fine print is simply wrong. The arbitration clause of the banking agreement is in the same size print as the other provisions of the contract, and is headed by an introduction in larger print, "Arbitration and Application of Law." As the basis for Webster's argument is erroneous, there is no ground for concluding that the arbitration agreement is unconscionable because it is hidden in fine print.

Webster's contention that the arbitration agreement is unconscionable because defendants buried the arbitration clause in a large number of documents is not well-taken. However many documents defendants may have provided, the "Account Agreement and Disclosure Statement," headed as such, was only two pages long, and it was introduced by a letter which began, "Please read the following underline carefully and in its underline entirety as it contains important information regarding your account." Banking agreement at 1 (emphasis in the original). Each section of the agreement had a brief heading in larger print than the main text that introduced the content of the section. As noted above, the arbitration clause was headed by an introduction that read, "Arbitration and Application of Law." It is unreasonable to argue under these circumstances that defendants attempted to hide the

arbitration clause.

Finally, Webster argues that the arbitration clause is unconscionable because it gives complete control of the arbitration process to Global and Rocky Mt., including the selection of the arbitrator and the structure of the arbitration process. This argument has merit, but as discussed later, will result in severance of this provision; it will not render the entire arbitration clause unenforceable.

In *Rains*, 23 P.3d 1249, a Colorado appellate court found enforceable an arbitration clause which selected an arbitrator by allowing the complainant to select the arbitrator from a list of three possibilities chosen by the opposing party. The court observed,

> While we recognize the potential fairness concerns raised by provisions permitting one side to choose the initial slate of arbitrators, *see, e.g., Hooters of America, Inc. v. Phillips,* 173 F.3d 933 (4th Cir.1999), we conclude that there are sufficient safeguards here to protect plaintiff's right to a neutral decision-maker.
> The arbitration provision by its terms requires that the arbitrator be neutral ("the arbitration shall be conducted by a single, neutral arbitrator who is licensed to practice law"). Further, both the AAA Commercial Arbitration Rules and the AAA Insurance Claims Dispute Resolution Procedures require disclosure of circumstances that may affect the arbitrator's impartiality, require the AAA to communicate such information to the parties, and provide that the parties may comment on the proposed arbitrator to the AAA, which then determines whether the person is to be disqualified. Similarly, § 13-22-205, C.R.S.2000, provides that a court, on application of a party, shall appoint the arbitrator if the method of appointment set forth in their contract "fails or for any reason cannot be followed." In light of these safeguards, we cannot conclude that the policy's mechanism for selecting arbitrators renders the arbitration provision unenforceable.

*Id.* at 1255. In *Hooters*, the Fourth Circuit refused to enforce as unconscionable an arbitration clause which included, *inter alia*, the following method of selecting an arbitration panel:

> The Hooters rules . . . provide a mechanism for selecting a panel of three arbitrators that is crafted to ensure a biased decisionmaker. Rule 8. The employee and Hooters each select an arbitrator, and the two arbitrators in turn select a third. Good enough, except that the employee's arbitrator and the third arbitrator must be

-27-

selected from a list of arbitrators created exclusively by Hooters.  This gives Hooters control over the entire panel and places no limits whatsoever on whom Hooters can put on the list.  Under the rules, Hooters is free to devise lists of partial arbitrators who have existing relationships, financial or familial, with Hooters and its management.  In fact, the rules do not even prohibit Hooters from placing its managers themselves on the list.  Further, nothing in the rules restricts Hooters from punishing arbitrators who rule against the company by removing them from the list. Given the unrestricted control that one party (Hooters) has over the panel, the selection of an impartial decision maker would be a surprising result.

*Hooters of America, Inc. v. Phillips*, 173 F.3d 933, 938-39 (4th Cir. 1999).

The arbitration clause at issue in the present case is even more open to potential abuse than the clause in *Hooters*.  The Global-Rocky Mt. arbitration clause provides that the arbitration shall be conducted by "an independent arbitrator of [defendants'] choosing." Banking agreement at 2.  The phrase, "independent arbitrator," is ambiguous, as it may mean an arbitrator who is neutral or merely one who is not employed by the defendants. The drafter's use of that term, rather than the term, "neutral arbitrator," raises questions as to defendants' intentions, particularly as nothing in the arbitration clause evidences any effort to ensure the arbitrator's neutrality.  The clause provides no hint of the criteria for selecting an arbitrator or of the procedures which the ensuing arbitration might use. Moreover, the complainant has no input whatsoever in the selection of an arbitrator.  A system so thoroughly controlled by one party invites abuse.  "Independent arbitrator" might be seen, therefore, as an attempt to lead the reader into reasonably expecting that the arbitration clause promises a neutrality that the clause makes no effort to guarantee.  In sum, the arbitration clause in the banking agreement raises reasonable expectations that defendants are not obliged to fulfill and unduly compromises a complainant's interests in

fundamental fairness.[2]

The defendants' arbitration clause might deceive an ordinary, objectively reasonable person into believing that the clause does not have the unconscionable effect of permitting defendants to skew the arbitration process.  To so thoroughly control the arbitration process while declaring the arbitrator's "independence" is a classic example of overreaching.  For these reasons, the arbitration clause as written is unenforceable as unconscionable under Colorado law.

That does not end the matter, however.  The banking agreement includes a severance clause:

> If any part of this Agreement is declared void or unenforceable, such provisions shall be deemed severed from this Agreement.  The remainder of this Agreement shall remain in full force and effect, and shall be modified to any extent necessary to give such force and effect to the remaining provisions.

Banking agreement at 3.  Even in the absence of a severance clause, Colorado law will sever unenforceable provisions in a contract that do not go to the essence of an agreement in an effort to preserve the rest of the agreement.  *See Shotkoski v. Denver Investment Group Inc.*, 134 P.3d 513, 516-17 (Colo. App. 2006).  The selection of an arbitrator and the arbitration procedures do not go to the essence of the banking agreement, an agreement for the purpose of managing funds used to pay creditors.  Consequently, having declared the provisions for selecting an arbitrator and conducting the arbitration unenforceable, the court must modify the arbitration clause to give effect to the remaining provisions.

Colorado law does not express any preference regarding methods of selecting an

---

[2]  It is worth noting that Colorado law gives evident partiality on the part of a supposedly-neutral arbitrator as one ground for vacating an arbitration award.  *See* 13-22-223(1)(a)(I), C.R.S.

arbitrator or particular arbitration procedures.  Defendants suggest that if the manner of

selecting an arbitrator is found to be unenforceable, the procedures endorsed by the AAA

should be used to select an arbitrator.[3]  As an arbitration clause is supposed to reflect the

intent of the parties, however, a better alternative would be to permit the parties to try to

reach an agreement regarding how an arbitrator should be selected and the procedures

that should be used in conducting the arbitration.  Only if the parties are unable to reach

an agreement should the court impose  arbitrator-selection and arbitration procedures on

the parties.  In that case, the arbitrator-selection procedures and arbitration procedures of

the AAA would be a reasonable choice to give effect to the arbitration clause.

IV.

For the reasons given above, Century's motion to compel arbitration should be

GRANTED.  Webster does not oppose Century's motion to dismiss if all claims against it

are sent to arbitration.  In *Green*, the Sixth Circuit quoted the Fifth Circuit as follows:

> The weight of authority clearly supports dismissal of the case when *all* of the issues
> raised in the district court must be submitted to arbitration. . . .
> Although we understand that plaintiff's motion to compel arbitration must be granted,
> we do not believe the proper course is to stay the action pending arbitration.  Given
> our ruling that all issues raised in this action are arbitrable and must be submitted
> to arbitration, retaining jurisdiction and staying the action will serve no purpose.  Any
> post-arbitration remedies sought by the parties will not entail renewed consideration
> and adjudication of the merits of the controversy but would be circumscribed to a
> judicial review of the arbitrator's award in the limited manner prescribed by law.

*Green*, 200 F.3d at 973 (quoting *Alford v. Dean Witter Reynolds, Inc.,* 975 F. 2d 1161, 1164

---

[3]  Defendants cite *McMullen v. Meijer*, Inc. 355 F.3d 485 (6th Cir. 2004), for the
proposition that the selection procedures of the AAA may be inserted to replace an
unenforceable arbitrator selection procedure.  This is not what *McMullen* decided.  The
Sixth Circuit remanded the case to the district court to determine which arbitrator-selection
procedures should be used.

(5th Cir. 1992)); *see also Hensel v. Cargill, Inc.*, 1999 WL 993775, at *4 (6th Cir. Oct. 19, 1999).  As Webster does not oppose dismissal in this eventuality and as Sixth Circuit caselaw supports such a dismissal, Webster's claims against Century should be dismissed with prejudice.

Global's and Rocky Mt.'s motion to compel should be GRANTED in part but DENIED as to enforcement of arbitrator-selection and arbitration procedures.  Instead, the parties should be given an opportunity to reach an agreement regarding how an arbitrator should be selected and the procedures that should be used in conducting the arbitration.  If the parties are unable to reach an agreement, arbitrator-selection and arbitration procedures should be imposed on the parties, as required by 9 U.S.C. § 5 ("§ 5").  In that case, the arbitrator-selection procedures and arbitration procedures of the AAA would be a reasonable choice to give effect to the arbitration clause, except that a single arbitrator should be appointed, as specified by § 5.

All of Webster's claims against Global and Rocky Mt. must be arbitrated.  Consequently, Webster's claims should be dismissed with prejudice, the court retaining jurisdiction solely to enforce its orders regarding selecting an arbitrator and arbitration procedures.

Finally, Global and Rocky Mt. also have pending before the court a motion to dismiss Webster's claims against them pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).  Doc. No. 25.  The arguments for and against that motion frequently address the merits of Webster's claims.  As Webster's claims must be submitted to arbitration, this court may not consider the merits of those claims.  Moreover, once arbitration has concluded, "[a]ny post-arbitration remedies sought by the parties will not entail renewed consideration and

adjudication of the merits of the controversy but would be circumscribed to a judicial review of the arbitrator's award in the limited manner prescribed by law."  *Green*, 200 F.3d at 973 (quoting *Alford,* 975 F. 2d at 1164).  Consequently, for these reasons, Global and Rocky Mt.'s motion to dismiss should be DENIED, as the court lacks jurisdiction to decide the merits of this action.


Date:  July 13, 2011                                s/ *Nancy A. Vecchiarelli*
                                                               U.S. MAGISTRATE JUDGE


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111.**